UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TIMOTHY A. POWELL,

              Plaintiff,

v.                                     Case No. 18-cv-1597-pp

ANGELA THOMPSON, *et al.*,

              Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 43) AND DISMISSING CASE**

---

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983. On November 19, 2018, Magistrate Judge Nancy Joseph (the assigned judge at that time) screened the plaintiff's complaint and allowed him to proceed on a deliberate indifference claim based on his allegations that the defendants refused to follow recommendations that he be sent to the spine clinic for evaluation. Dkt. No. 9 at 4. On August 19, 2019, the defendants filed a motion for summary judgment. Dkt. No. 43. The court will grant the motion and dismiss the case.

**I. RELEVANT FACTS**

The plaintiff is an inmate at Redgranite Correctional Institution. Dkt. No. 46 at ¶1. Defendant Dr. Dilip Tannan works for the Department of Corrections' Bureau of Health Services. Id. at ¶2. He currently works as a physician at Oshkosh Correctional Institution, but he also worked at

1

Redgranite one day per week during the events described in the complaint. Id. Defendant Angela Thompson currently works for the DOC as the health services manager at Redgranite. Id. at ¶4. She worked there as a registered nurse from October 6, 2014 to September 3, 2017. Id.

The plaintiff has a history of complaints of chronic pain in his back and neck, and has diagnoses of various conditions causing that pain. Dkt. No. 51 at ¶8. On February 9, 2017, Dr. Tannan saw the plaintiff for multiple complaints of back and neck pain. Id. at ¶9. According to the medical records, Tannan noted that the plaintiff had an appointment scheduled with the UW Rheumatology Security Clinic (rheumatology) and that he had no restrictions on activities of daily living. Id.; Dkt. No. 45-2 at 127. Tannan observed that the plaintiff "certainly doesn't appear to be a surgical candidate." Dkt. No. 45-2 at 127. He recommended conservative treatment and physical therapy for the plaintiff's neck; he also considered referring the plaintiff to a pain clinic. Id.

The plaintiff was seen by rheumatology a couple of months later, on April 14, 2017, for the following problems: "(1) chronic lower back pain with limited range of motion; (2) bilateral sacroiliac (SI) tenderness; (3) sacral and lumbar spine tenderness; (4) morning stiffness; (5) left trochanteric bursitis; (6) myofascial pain syndrome; (7) GERD; (8) peripheral neuropathy; [and] (9) spinal stenosis of C4-C6." Dkt. No. 46 at ¶10. (Neither party explains the meaning of the technical, medical terms.) Rheumatology recommended that the plaintiff have a lumbar spine MRI and bilateral SI joint MRI to look for

2

sacroiliitis and L-spine changes. Id. at ¶11. It also recommended starting meloxicam (a nonsteroidal anti-inflammatory drug, "NSAID") and physical therapy. Id. It recommended that the plaintiff be provided with a seat cushion, but the plaintiff says that Tannan did not provide him with one. Dkt. No. 51 at ¶11.

About two months later, on June 15, 2017, Tannan saw the plaintiff for a follow-up appointment. Dkt. No. 46 at ¶12. Tannan recommended continuing with conservative treatment and physical therapy. Id. The plaintiff asserts that he told Tannan that the conservative treatment and physical therapy were not working. Dkt. No. 51 at ¶12. Tannan also approved a prescription for meloxicam and ordered an MRI of the lumbar spine and bilateral SI joint. Dkt. No. 46 at ¶12. The MRI occurred about a month later, on July 19, 2017. Id. at ¶13.

The plaintiff was seen again by rheumatology via televisit about a month later, on August 14, 2017. Id. at ¶14. Rheumatology recommended that the plaintiff switch from meloxicam to naproxen, switch from Lyrica to duloxetine for his reported fibromyalgia/myofascial pain, consider a referral to the spine clinic for his back pain, and continue exercises for his trochanteric bursitis. Id. (Again, neither party explains the meaning of the technical, medical terms.) According to Tannan, he reviewed the recommendation that the plaintiff be referred to the spine clinic, which would assess whether the plaintiff was a candidate for surgical intervention. Id. at ¶15. Tannan asserts that he declined

3

to make the referral. Id. at ¶16. He explains that, based on his review of the plaintiff's records, physical exams and documentation from nursing staff about the plaintiff's participation in the sweat lodge and his functioning within the unit, he believed that the plaintiff did not need to be evaluated for surgical intervention by the spine clinic. Id.

A couple of weeks later, on September 1, 2017, Tannan ordered an EMG of all four of the plaintiff's extremities. Dkt. No. 46 at ¶17 (citing Dkt. No. 45-2 at 212). Neither party explains what an EMG is or what purpose it serves. The plaintiff explains that the EMG, which was performed offsite, was done only on his left side. Dkt. No. 51 at ¶17. The interpretation read: "This is a normal study. There is no evidence for peripheral neuropathy, brachial plexopathy, lumbosacral plexopathy or radiculopathy in the left upper and left lower extremity." Dkt. No. 55 at 9.

On October 10, 2017, Dr. Springs (who is not a defendant) referred the plaintiff to the spine clinic for his neck and lower back pain. Dkt. No. 46 at ¶55. When a doctor refers an inmate to an offsite provider, a nurse signs off on the order, makes a photocopy and turns it over to a medical program administrative assistant to make the appointment. Id. at ¶54. According to defendant Thompson, due to a clerical error, Spring's referral was unintentionally overlooked, so the plaintiff was not evaluated by the spine clinic until August 2018. Id. at ¶55. Although the plaintiff does not dispute that the referral was overlooked, the court notes that Thompson does not

specify who overlooked the referral, why the referral was overlooked, or even how she knows that the referral was overlooked (as opposed to ignored).

Tannan saw the plaintiff again a couple of weeks later, on October 26, 2017. Dkt. No. 46 at ¶18. Dr. Nicholson and Nurse Barter (who are not defendants) were present. Id. According to Tannan, the plaintiff walked with a steady gait and had no apparent discomfort or limp. Dkt. No. 46 at ¶18. Tannan also noted that the plaintiff regularly participates in the sweat lodge, where he sits on the ground for long periods of time. Id. at ¶19. He also observed that the plaintiff's neuropathy symptoms were inconsistent with the EMG findings. Id. The plaintiff responds that he was not walking with a steady gait; he was using a cane that Tannan had provided him. Dkt. No. 51 at ¶19. He also notes that he did not sit on the ground during sweat lodge; he sat on five folded blankets, which staff had provided him to help reduce the pain. Id. The plaintiff again emphasizes that the EMG was performed only on his left side. Id.

Tannan did not determine a plan of care because the plaintiff cut the examination short and walked out of the room before Tannan could examine his foot. Dkt. No. 46 at ¶20. The plaintiff explains that he walked out of the room because Tannan kept calling him a liar and disregarded the podiatrist's diagnosis that the plaintiff had plantar fasciitis. Dkt. No. 51 at ¶20.

On November 8, 2017 and December 14, 2017, Nicholson saw the plaintiff for complaints of neck and back pain and issues with his medication.

5

Dkt. No. 46 at ¶21. According to Nicholson, he suggested a referral to pain management for the plaintiff's neck pain and a follow-up appointment with rheumatology. Id.

A couple of months later, on February 2, 2018, the plaintiff was seen by rheumatology by televisit. Dkt. No. 46 at ¶22. Rheumatology recommended switching the plaintiff to ibuprofen from Lyrica and suggested providing him with a medical mattress and pool exercises. Id. Less than a week later, Tannan reviewed rheumatology's report. Id. at ¶23. He noted that the plaintiff's reported symptoms did not match reports of the plaintiff's functional level. Id. at ¶¶23, 28-36. Tannan discontinued Lyrica; however, someone—the record is not clear as to who—ordered a new back brace to provide the plaintiff with lumbar sacral support. Id.

Less than a month later, on March 1, 2018, Tannan had a follow-up appointment with the plaintiff. Dkt. No. 46 at ¶24. Thompson was present. Id. Tannan noted that the plaintiff's complaints and symptoms were subjective; he opted to continue with Tylenol and ibuprofen for pain management. Id. at ¶24, 38. About three months later, the plaintiff had a scheduled appointment with Tannan, which he refused to attend. Id. at ¶25. The plaintiff explains that he refused to go because Tannan never gave him adequate treatment and always told him he was a liar and was faking his pain. Dkt. No. 51 at ¶25.

On July 18, 2018, Tannan saw the plaintiff for a follow-up appointment for several issues. Dkt. No. 46 at ¶43. Dr. Ibirogba (who is not a defendant) and

6

Thompson were present. Id. By this point, the plaintiff had tried Gabapentin, Lyrica and duloxetine without success (the plaintiff explains that the medications made him nauseous). Id.; Dkt. No. 51 at ¶43. The plaintiff was being treated with conservative treatments such as NSAIDS and acetaminophen and stretching exercises; he had also used a TENS unit with some success. Dkt. No. 46 at ¶43. Tannan ordered that the plaintiff continue with these treatments; he also referred the plaintiff to the spine clinic to determine his candidacy for surgical intervention to address his spine pain. Id.

According to Tannan, medical judgment indicates that doctors try the least invasive treatments before trying invasive, risky procedures like surgery. Dkt. No. 46 at ¶46. Tannan explains that the plaintiff's EMG's were negative, and MRIs showed mild to moderate conditions. Id. He also explains that, by that point, they had tried injections from the pain clinic, physical therapy and continued assessments from rheumatology. Id. Because these measures had proved unsuccessful, Tannan referred the plaintiff to the spine clinic. Id.

About a week later, on July 25, 2018, Tannan provided a doctor-to-doctor report to Dr. Houtan Taba of the spine clinic (who is not a defendant) via telephone consult. Dkt. No. 46 at ¶48. According to Thompson, consults typically include a description of the patient's situation and health background, an assessment and an identification of relevant problems. Id. Doctors also respond to any questions the spine clinic may have. Id. Thompson states that

7

two additional calls are documented on July 31, 2018 (for records) and August 1, 2018 (for imaging). Id.

On August 8, 2018, Taba reviewed the plaintiff's electronic clinical records and medical imaging, including MRIs taken on October 26, 2016, November 20, 2016 and July 19, 2017. Dkt. No. 46 at ¶49. Following his review, Taba concluded, "I have reviewed the MRI and flouro images. He has a pathology that is too mild for surgical intervention. He may be appropriate to be evaluated with a non-surgical provider." Id. at ¶50. Taba never examined the plaintiff in person; he only reviewed his records and spoke to Tannan. Dkt. No. 51 at ¶45. Tannan explains that the plaintiff was already being evaluated by non-surgical providers, so Taba's assessment did not impact the plaintiff's plan of care. Dkt. No. 46 at ¶51.

Ibirogba saw the plaintiff on September 13, 2018. Dkt. No. 46 at ¶52. He noted the spine clinic's report and decided to continue with the plaintiff's current medications and analgesics, stretching exercises and warm compresses to help alleviate his pain. Id. The plaintiff had a scheduled follow-up appointment with Tannan on November 1, 2018, but he refused to go. Id. at ¶27.

In total, between February 2017 and July 2018, Tannan saw the plaintiff approximately seven times regarding his back and neck pain. Dkt. No. 46 at ¶26. During that time, the plaintiff also saw Drs. Springs, Nicholson and Ibirogba (none of whom are defendants) for the same issues; he also had

numerous encounters with nurses. Id. The plaintiff asserts that none of them did anything to address his spine injury. Dkt. No. 51 at ¶26. Further, the plaintiff saw rheumatology four times between April 2017 and February 2018. Dkt. No. 46 at ¶26. And, he visited the Waupun Memorial Hospital Center for Pain Care regarding his headaches, neck and shoulder pain, where he received a cervical epidural injection. Id.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

9

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

    B.    <u>The Court's Analysis</u>

        1.    *Defining the Claim at Issue*

When Judge Joseph screened the plaintiff's complaint, she allowed him "to proceed on a deliberate indifference claim against Thompson and Dr. Tannan based on his allegations that, despite his repeated requests, they refused to follow recommendations that he be sent to the spine and/or neurosurgery clinics for evaluation." Dkt. No. 9 at 4. The plaintiff alleged in his complaint that "[o]n 7-18-18 I agreed to see A. Thompson, RN/HSM, Dr. Dilip K. Tannan and Dr. Ibirgoba. They referred me to UW Ne[u]rosurgery for evaluation." Dkt. No. 1 at 3. The evidence clarifies that this referral was only to the spine clinic, not also to neurosurgery. See Dkt. No. 46 at ¶¶43, 45. So, while Judge Joseph allowed the plaintiff to proceed against the defendants because they allegedly delayed scheduling an appointment at the spine *and/or* neurosurgery clinics, the evidence reveals that the only referral at issue is one to the spine clinic.

10

The court clarifies the scope of the plaintiff's claim because, in his response materials to the defendants' motion, the plaintiff attempts to add additional claims by asserting that (1) the defendants denied him "proper pain medication for his fibromyalgia, spondylosis, L4-L5, L5-S1 impingements as [well as] C4-C6 impingements;" (2) "Thompson's staff [is not] efficient and effective;" (3) "Thompson does not provide overall administrative direction of HSU;" (4) the special needs committee "has denied all specialist recommendations for a seat cushi[o]n . . . and denied [the plaintiff's] several request[s] for a medical mattress;" (4) he "suffers from Fibromyalgia," and his "complaint of pain is consistent with fibromyalgia . . ." ; and (5) "Tannan and HSUM Thompson do[] not adhe[re] to [their] own chronic pain treatment care plan guidelines." Dkt. No. 57 at ¶¶2, 7, 9, 10, 13, 16, 22, 44. In his brief, he argues that Thompson refused to give him a seat cushion or a medical mattress (on the advice of what he says are unnamed staff). Dkt. No. 54 at 8. In his own proposed findings of fact, the plaintiff accuses Tannan and Thompson of viewing him as a "drug seeker," dkt. no. 52 at ¶18, and of failing to follow Department of Corrections policy in recording his pain, dkt. no. 52 at ¶19.

None of these assertions are included (or even hinted at) in the plaintiff's *complaint*, and none is relevant to the narrow claim on which Judge Joseph allowed the plaintiff to proceed. Although courts typically will allow a plaintiff to pursue an alternative legal theory based on allegations in the complaint, they reject a plaintiff's attempt to introduce new facts at summary judgment

11

that were not included in the complaint. Abuelyaman v. Ill. State Univ., 667 F.3d 800, 813-14 (7th Cir. 2011) ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion."); Messner v. Calderone, 407 Fed. App'x 972, 974 (7th Cir. 2011) ("A plaintiff cannot add additional claims through arguments made in opposing summary judgment . . .") Because the plaintiff's complaint does not place Tannan and Thompson on notice that he is suing them based on allegedly deficient pain management care, denial of a seat cushion and mattress, or failure to treat his fibromyalgia, the court declines to consider these claims at summary judgment. See, *e.g.*, Messner, 407 Fed. App'x at 974.

2. *The Defendants' Delay in Referring the Plaintiff to the Spine Clinic*

"[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., No. 18-2351, 2019 WL 2498640, at *3 (7th Cir. June 17, 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." Id. (quoting Petties v. Carter, 836 F.3d 722, 727-28 (7th Cir. 2016) (*en banc*)).

12

The court concludes that the plaintiff's back and neck pain constitute an objectively serious medical condition. The defendants don't argue to the contrary; instead, they focus their arguments on whether they were deliberately indifferent to that condition when they failed to immediately implement Springs' October 2017 referral to the spine clinic.

The parties agree that Springs referred the plaintiff to the spine clinic in October 2017. The plaintiff asserts that he told the defendants about the referral multiple times and asked them why they were not scheduling his appointment. Dkt. No. 57 at ¶21; Dkt. No. 1 at 2-3. Tannan made his own referral to the spine clinic in July 2018, about ten months later. This ten-month delay is the basis for the plaintiff's claim.

"In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." Williams v. Liefer, 491 F.3d 710, 715 (7th Cir. 2007). In other words, to survive summary judgment on a delay-in-treatment claim, the plaintiff must present evidence from which a jury can reasonably conclude that the delay in treatment was detrimental to him. Id.

Tannan had a doctor-to-doctor consult with Taba at the spine clinic on July 25, 2018; a couple of weeks after that, on August 8, Taba opined that the plaintiff's pathology was too mild for surgical intervention, but that he might be appropriate to be evaluated by non-surgical providers.

13

Tannan explains that Taba's assessment did not affect the plaintiff's plan of care. In between the time Springs referred the plaintiff to the spine clinic (October 2017) and the time Tannan referred the plaintiff to the spine clinic (July 2018), the plaintiff was taking Lyrica, NSAIDS and acetaminophen for the pain, performing stretching exercises, using a TENS unit, receiving injections from the pain clinic, attending physical therapy and consulting with rheumatology. After Taba opined that surgery wouldn't help the plaintiff, Tannan (and, later, Ibirogba) continued doing what they were already doing. In short, the spine clinic suggested or provided nothing to relieve the plaintiff's pain that he wasn't already receiving. Accordingly, no reasonable jury could conclude that the plaintiff suffered a detriment as a result of the ten-month delay in scheduling a spine-clinic appointment.

The plaintiff does not dispute that he did not receive additional relief or treatment from Taba at the spine clinic. Instead, he argues that Taba's conclusion that he was not a surgical candidate was incorrect. He asserts (without any support other than his say-so) that Taba reached his conclusion because Tannan tainted Taba's impression of the plaintiff's condition and because Taba relied only on the plaintiff's medical records rather than examining him in person. Dkt. No. 57 at ¶¶46, 48.

Even assuming the alleged basis for Taba's opinion was improper (and, again, the plaintiff offers no evidence from which a jury could reach that conclusion), Taba is not a defendant. Under §1983, defendants cannot be held

14

liable for another person's misconduct. See Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (internal quotation marks and citation omitted). Tannan provided his opinion to Taba as well as verifying medical documents such as MRIs and the EMG results. The information that Taba decided he needed to form an opinion and the opinion he reached based on his review of that information were up to him, and the court will not hold Tannan liable for those decisions.

The court notes that while Springs ordered the spine clinic referral for the plaintiff on October 10, 2017, Thompson asserts that "[d]ue to a clerical error, Dr. Springs's referral was unintentionally overlooked and [the plaintiff] was not evaluated by the UW Spine Clinic until August 2018." Dkt. No. 44 at ¶14. The plaintiff says that Tannan and Thompson "refused to follow Dr. Spings [sic] order." Dkt. No. 52 at ¶21. The plaintiff has produced no proof that Tannan and Thompson knew about Springs's order but refused to follow it. But the court has concerns about Thompson's claim that because of a "clerical error," Springs's order was overlooked, and that fact that she herself links that to the reality that the plaintiff wasn't evaluated at the spine clinic until ten months later. A reasonable jury could not find on these facts that *Thompson* was deliberately indifferent to the plaintiff's serious medical need—there is no evidence that *Thompson* committed the clerical error or that *Thompson*

15

overlooked Springs's order. Even if she had, her actions would have been negligent, rather than deliberately indifferent. See, *e.g.*, Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("deliberate indifference describes a state of mind more blameworthy than negligence"). But the "clerical error" that resulted in Springs's order being "unintentionally overlooked" played a role in the claim the plaintiff brings. The plaintiff perceives that his treatment was delayed because it was months between Springs's referral order and the plaintiff's trip to the spine clinic; that perception could have been avoided with a prompt referral to the spine clinic.

Because the plaintiff has offered no medical evidence from which a jury could reasonably conclude that the defendants' delay in effectuating Springs' referral to the pain clinic caused him any detriment, the court will grant the defendants' motion for summary judgment.

### III. CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 43. The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or

excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 5th day of February, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER
Chief United States District Judge**